## Robert Porter v. Mary A. Porter.

1. SEPARATE MAINTENANCE—*Statutory Requisites.*—The living of a married woman separate and apart from her husband, in order to entitle her to a decree for separate maintenance, must be without her fault.

**Bill for Separate Maintenance.**—Appeal from the Superior Court of Cook County; the Hon. JOHN BARTON PAYNE, Judge, presiding. Heard in this court at the March term, 1895. Reversed, and bill dismissed. Opinion filed June 3, 1895.

THORNTON & CHANCELLOR, attorneys for appellant.

THOMPSON, HAWES & McCASLIN, attorneys for appellee.

MR. PRESIDING JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

This was a suit for separate maintenance.

Appellee married a widower twenty years her senior, he having a grown-up daughter living with him. She took her sister to live with her and insisted against her husband's advice upon having her brother James come to live with them. Appellant told her that he had a young girl growing up and James was a young man, and the way the rooms were situated, he, appellant, did not think it would be a good thing to have James come; it might create trouble. Her brother John also came to live in the family.

They lived, he testifies, for one year harmoniously; she

now complains that she was not provided with such money for clothing or with such help and medical attendance as she needed.

He was in debt, his property was mortgaged, much of it entirely unproductive; his income being derived from a livery business which he carried on and in which he worked.

There is no evidence tending to show that his income was over $1,500 per annum. All that he possessed he had gained by hard work, and it could be kept only by constant attention and prudence. He evidently appreciated the necessity for economy more than did she; but that she had any cause in this regard for complaint there is no evidence, such as ought to move a court of equity to take out of his hands the control of the question as to in what style he should maintain appellee.

After a time he became suspicious of the conduct of her brother James, whom, against his remonstrance, she had brought into his family. This brother, he feared, was unduly intimate with his daughter, and told appellee so; she treated the fear lightly, as unwarranted and unjust.

The daughter was found to be pregnant and she declared that appellee's brother James was the father of her child.

Appellant says that he went to the stock yards to find James; that James avoided him.

Appellant told appellee that James must leave the house; she said that she did not like to have him leave, but he did depart. Whereupon appellee forsook appellant's bed and took up her abode in the room above, which her brother had vacated. To this appellant objected, but she persisted and never returned. Appellant says that after this, things were unpleasant.

After living in this way for some time, he went to her room and gave her twenty dollars. Their marital relations were resumed, although they seem to have continued, she to sleep up and he down stairs.

Appellant's son was very fond of his father, who says he noticed that appellee wished to wean little Harold from

him; that the boy had the habit of running toward him saying, "Hullo, pa, I will kill you." Appellant thus describes what followed:

He did this a great many times, and I says to him, "Harold, where in the world did you learn that?" "Oh, I don't know," was all the answer I could get, and I asked Mrs. Porter how he learned that. He heard the boys say so out doors. "Well," says I, "now this is very strange."

On this particular night I came home about half past eight o'clock. There was no one in the house. I sat down stairs until she came home. He came running towards me, and says, "Hullo, pa, I will kill you." And I says, "Harold, who in the world is learning you bad talk? Some one must be learning you it. I am afraid you are getting bad bringing up." And she flew into a passion and she says, "I would hope that he was getting better bringing up than your daughter, Lill." I says to her, "Mame, what do you mean?" "Well," she says, "I mean that you are nothing but a brute. That you have been intimate with your own daughter." That is what she said, and that was the cause of the trouble. I says, "You dirty, vile woman. If you were a man I don't know what I would do. You know it is lies from beginning to end. As long as you think that of me it is an impossibility for you and I ever to live together as man and wife." She went up stairs. In the morning I says, "Mame, I have been thinking this thing over all night. I haven't slept any over this." And she said, "I mean just what I say." I says, "If I am that kind of a man you and I certainly can't live together, and if you want to, decently let me know what you want; you and I had better separate if you think that way of me." I came home to dinner; came home to supper and got my supper and that night I slept there; she was up stairs; and the next morning I got my breakfast. There was nothing said during this time, and I came back to dinner, and discovered that she had had a wagon there; had taken away a lot of goods from the house, and went away. I did not tell her to get out, nor words equivalent to that. I went to Mr.

Ehart's to see my boy. · There was no objection made to my first call. The next time I called she met me. She says, "What are you doing here?" "Well," I says, "I come to see my boy." "Well," she says, "I don't want you to come around here at all." "Well," I says, "if the people of the house say so, I certainly won't come." "Well, I don't want you to come. If you come around bothering me, I will go somewhere else." Says I, "I can't help that, I want to see my little boy." Then I says, "I am keeping this house open for you." She says, "Don't you keep it open for me one minute; I will never live with you again." And then on the top of that she says, "If I was your daughter, Lill, I would take a revolver and put a bullet in your head." The following day I received a letter from her first attorney in this case, stating that I must keep away from the house. So I stayed away from the house until I went there to see my boy when I heard that he was hurt. I never told her at any time to get out of the house, nor to keep away from the house.

As to making the terrible accusation of incest, appellee testified:

"In my last conversation with Mr. Porter before leaving the house, I alluded to him as being the cause of his daughter's ruin. That is what I said. I charged him with what she said. He said there was nothing but brute instinct in me. He was angry.

The daughter testified that she never told appellee or any one else anything of the kind.

Appellee testifies that her husband once expressed to her his belief that she was unduly intimate with a certain physician; if such statement was made, it was without cause; as related by appellant it seems to have been more the rude utterance of a coarse man than an accusation to which any one attached importance.

Appellee filed an amended bill verified by her oath, alleging that during the month of February or March, 1890, appellant asked her to have unnatural relations with him and sought to compel her to do so. That about the

month of July, 1891, appellant did the same thing. She left him in February, 1893.

There was no evidence that would sustain this horrible charge; the court below found that it had not been proven, and at the hearing expressed the opinion that the charge of incest by appellant with his daughter was untrue, and that the court did not think appellee thought it true.

Appellant was not a "carpet knight to caper nimbly in a lady's chamber." He was a plain, rough, and according to the statements of appellee, coarse man; rising early, working late, among horses and hostlers. He had a bad habit of swearing when annoyed, as he often was, at household bills which he thought large and found it not easy to pay. Appellee came to hate him. She prayed to God that she might never see his hateful face again; she declared that she would die before she would cook for him again; behind his back she called him old devil and old Porter; she denies that she swore at, save in mocking of, him. She found time and had money to go to theaters and races; she denies the statements of disinterested witnesses that she bought lottery tickets. His amusement seems to have been confined to listening to the prattle of his boy. Had he been more of a gentleman he would not have used profane language, and he would have borne his wife's constant appeals for money for her personal convenience and pleasure with more equanimity, perhaps with greater acquiescence. Nevertheless, it is but just to say that there is nothing in this record showing that he ever failed to provide a comfortable home and support for his family, or that he ever refused to her spending money, when his pecuniary circumstances were such that, with due regard to his business and its obligations, he had it to give.

He was not a model husband, but he does seem to have made repeated efforts to end their bickering; to have felt that he owed to his wife some duty, and to have looked upon the marriage obligation as a thing of consequence.

The preponderance of the evidence given by disinterested witnesses does not sustain her charges of brutal speech and conduct.

He seems to have suffered more than did she, and his patience was more severely tried by the course of their family life than was hers. Under the circumstances she could well have overlooked much in a man who saw his daughter's ruin following the persistence of appellee in bringing and keeping her brother James in the house.

Whatever may be its effect, our statute as to separate maintenance was not intended to act as an encouragement to wives to leave their husbands.

As the wife of appellant, living with him, duties would rest upon her; burdens in respect to his comfort and the care of his family must be borne. By the decree in this case she is given a sum amounting to more than half of his entire income—an income which he has only as the fruit of unremitting toil; while she is, under this decree, called upon to do no more than the "lilies of the field."

Few persons, men or women, would have acted more mildly than did he under the immediate cause of the separation—her unjustified charge of incest. Going away upon the strength of what he then said was not going away without fault upon her part.

He offered and still offers his home to her, to receive and treat her kindly; she is persistent in her refusal.

She is not "without her fault living separate and apart from her husband."

The duties and obligations of marriage are altogether too frequently looked upon as something that may be shaken off at pleasure. The decree of the Superior Court is reversed and the bill dismissed.